IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BILLIE ROGERS, | ) | CASE NO. 5:17-CV-1087 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Billie Rogers ("Rogers") seeks judicial review of the final decision of Defendant

Commissioner of Social Security ("Commissioner") denying her application for Disability

Insurance Benefits ("DIB"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc.

13.

As set forth more fully below, the Administrative Law Judge ("ALJ") did not sufficiently

explain his reasons for concluding that Rogers' statements concerning her symptoms were not

fully credible. Thus, the Court cannot ascertain whether substantial evidence supports the ALJ's

credibility determination or his evaluation of the opinion evidence because the ALJ relied, in

part, on his credibility determination when evaluating the opinion evidence. For the reasons

stated below, the decision of the Commissioner is **REVERSED** and **REMANDED** for further

proceedings consistent with this opinion.

## I. Procedural History

Rogers protectively filed her application for DIB on August 30, 2014, alleging a

disability onset date of March 4, 2014. Tr. 12, 143. She alleged disability based on the

following: post-traumatic stress disorder, anxiety, severe mood swings, and depression. Tr. 191. After denials by the state agency initially (Tr. 77) and on reconsideration (Tr. 87), Rogers requested an administrative hearing (Tr. 101), and to amend her onset date to August 30, 2014 (Tr. 164). A hearing was held before Administrative Law Judge ("ALJ") Charles Shinn on June 2, 2016. Tr. 27-63. In his June 17, 2016, decision (Tr. 12-22), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Rogers can perform, i.e. she is not disabled. Tr. 21. Rogers requested review of the ALJ's decision by the Appeals Council (Tr. 140) and, on May 11, 2017, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Rogers was born in 1969 and was 44 years old on the date her application was filed. Tr. 28. She graduated from high school and last worked in August 2014 as a latex inspector/packer. Tr. 33, 36-37.

### B. Relevant Medical Evidence

On August 4, 2014, Rogers saw nurse practitioner Judith Corcelli at Portage Path Behavioral Health for medication management and mood/behavior problems. Tr. 280-281. She requested a different anxiety medication because the previous medication had caused headaches. Tr. 280. Her Prazosin helped her sleep through the night and she wasn't having nightmares. Tr. 280. She was still working. Tr. 280. Upon exam, her activity was average, she was adequately groomed, had average eye contact, clear speech, a constricted/blunted affect, cooperative behavior, a depressed mood, fair judgment and insight, and logical thoughts. Tr. 280. Corcelli

adjusted Roger's medications and recommended a follow-up appointment in 10 to 12 weeks. Tr. 281.

At her next visit with Corcelli on October 17, 2014, Rogers reported that she was taking her medications as prescribed and that they were helping and she had less problems with anger, although the medications were not lasting all day. Tr. 276. She stated that when things aggravate her she is now more easily able to let them go. Tr. 276. She was still having problems with anxiety, anger, and nightmares and reported breaking out in hives when she saw the consultative examiner in connection with her disability application. Tr. 276. She had to wait two hours for the doctor and it was too much for her. Tr. 276. She reported panic attacks a couple of times a month that made her feel like she was having a heart attack. Tr. 276. She was fired from her job due to attitude problems. Tr. 276. She rated her anxiety and depression 8/10 and stated that she does not want to leave the house. Tr. 276. Her mental exam findings were the same as her prior visit, although her mood was also irritable. Tr. 276. After seeing Corcelli, Rogers saw licensed social worker Cynthia Ball, M.S. Tr. 278. Rogers explained that she was fired because she threatened her boss after he got in her face "again" and had gotten very angry when work changed her shift time by a half an hour, stating, "I don't like change." Tr. 278. She has problems keeping jobs due to her refusal to let people talk to her "like that." Tr. 278. The day after she was fired her friend was also fired for standing up for herself when the supervisor got nasty. Tr. 278. Her co-workers told her that she is too angry and she agrees. Tr. 278. She is angry with her husband, who, now that she is unemployed, expects her to wait on him. Tr. 278. She is pretty happy until someone "pisses her off," which is very easy to do. Tr. 278. She is "always on the edge of being angry" and she does not like to be around many people because she is afraid someone will do something to make her angry. Tr. 278. Her attitude has gotten worse

since her grandmother died 15 months ago and her kids moved out of state. Tr. 278. She gets mad at other drivers and she feels like other people are always doing things to make her mad. Tr. 278. Upon exam, Rogers was angry, anxious, and depressed with a dichotomous thought process; her other findings were unchanged. Tr. 278. Ball suggested that Rogers' anger would be "a normal response to a lot that has happened to her." Tr. 278.

On November 11, 2014, Rogers reported to Ball that her increase in Zoloft had been helpful and that she could "see that a lot of things are not as bad as she would have once thought." Tr. 274. She was sleeping less and had more interest in performing her daily activities. Tr. 274. Her main stressor that day was that her cat might be pregnant, although her veterinarian had previously stated that her cat could not get pregnant; she planned to take her cat to the veterinarian for a correct diagnosis. Tr. 274. Her mental status exam findings were unchanged. Tr. 274. Ball joined Rogers in "chuckling about the 'miracle kittens' that she may have when she comes in next time." Tr. 274.

On December 4, 2014, Rogers saw Corcelli for medication management. Tr. 271-271. Her nightmares were improving and she was still depressed, did not want to go anywhere, was "very edgy" and irritable. Tr. 271. She experienced stress from visits from family and friends, including children, who had visited her and she noted that her house was not baby-proof. Tr. 271. Her cat had had kittens. Tr. 271. She reported having a little more energy during the day but stated that she was not getting continued improvement with irritability. Tr. 271. Upon exam, she had a full affect, cooperative behavior, an anxious mood, fair insight and judgment and a logical thought process. Tr. 271. Corcelli adjusted her medication. Tr. 272.

On December 9, 2014, Rogers saw Ball, reporting an "ok" Thanksgiving holiday until her mother-in-law dropped by and started making "critical remarks." Tr. 269. Rogers allowed that

her mother-in-law's behavior had gotten worse since a severe head injury and that she did not know whether that was the cause of her behavior. Tr. 269. Ball discussed reasonable expectations regarding Roger's mother-in-law's behavior and reminded her that she had the ability to choose how much time she spent thinking about it. Tr. 269. Upon exam, her mood was angry and her thought process was dichotomous. Tr. 269.

On January 14, 2015, Rogers saw Ball and reported that she had found homes for all the kittens. Tr. 306. Her son and his girlfriend had moved back from West Virginia and into her home and were looking for work. Tr. 306. Her husband continued to annoy her despite her requesting he stop; this caused her to break out in hives and she had threatened to punch him, but knows that she would get into trouble if she did. Tr. 306. Upon exam, her mood was angry and anxious and Ball counseled her on reflective techniques and encouraged her to have her cats fixed. Tr. 306.

On February 6, 2015, Rogers saw Ball again and complained of continuing irritation with her husband concerning things he did and said that she found annoying despite the fact that she has asked him to stop. Tr. 304. She believed that, if he cared about her, he would stop. Tr. 304. To her, this was a very big deal. Tr. 304. Upon exam, her affect was appropriate, she was cooperative, her mood was depressed and angry, and her thought process was dichotomous. Tr. 304. Ball "normalized her annoyance" with her husband's behavior and counseled her on how to rate problems, 10 being life-threatening, and commented, "Client kept insisting that her annoyance is a 10, even though it is not life threatening." Tr. 304. Rogers was "resistant" to reconsidering the level of her response but was willing to think about it as well as gender differences and her expectations. Tr. 304.

On February 19, Rogers saw Corcelli for medication management.  Tr. 301.  She reported that her mood was bad and that she became angry in the evenings when her husband came home and threw his clothes on the floor instead of the laundry basket.  Tr. 301.  She liked to be home in the quiet.  Tr. 301.  She reported getting angry when sitting in a physician's office for a long period of time.  Tr. 301.  Upon exam, her affect was blunted/constricted, she was cooperative, and her mood was anxious and irritable.  Tr. 301.  She indicated that the benefits of her mood stabilization medication (Lamotrigine) had started to wane and Corcelli increased her dosage. Tr. 302.

On March 18, Rogers saw Ball, stating that she was less irritable and her husband's annoying behavior did not "get to her" as much anymore.  Tr. 298.  Her increased dosage had helped her, but not when her 14-year old dog died suddenly in the back yard and she had to take him to the veterinarian to be cremated.  Tr. 298.  She was bothered by her husband and wanted to leave him but could not because she did not have any money.  Tr. 298.  She believed her husband could kick her out because she was not sure if the house belonged to her too.  Tr. 298.  She did not think she could tolerate a workplace because "the last one was so bad" and she could not handle a supervisor who "gets in my place."  Tr. 298.  She believes that she has to yell back or strike out physically because that is what she has always done.  Tr. 298.  Upon exam, she was cooperative, her affect was appropriate, her mood was angry and depressed, and she had a dichotomous thought process.  Tr. 298.  Ball emphasized that it was normal Rogers should feel bad when her dog died and challenged her conclusions about workplaces in general based on her experience in one exceptionally bad workplace.  Tr. 298-299.  She assured Rogers that no one likes people "getting in their face" and encouraged Rogers to walk away rather than fight,

although Rogers was skeptical that walking away would prevent people from staying out of her face.  Tr. 299.

On April 2, 2015, Rogers told Corcelli that she continued to have problems with anxiety and irritability.  Tr. 295.  She gets itchy when she is around other people and she is having problems with road rage.  Tr. 295.  Upon exam, her affect was constricted/blunted and her mood was depressed.  Tr. 295.  On May 1, Rogers told Ball that she remains very irritable and that her increased Lamotrigine has not helped.  Tr. 292.  She was almost in a road rage incident when a car almost rear ended her and she jumped out of her car and yelled at the offending driver.  Tr. 292.  She stated that she feels like there is always someone following her or watching her, which is why she stays in her house as much as possible.  Tr. 292.  She is afraid that someone may be trying to kill her and expressed a fear of dying and being unhappy with bugs crawling on her in her grave.  Tr. 292.  Upon exam, her affect was appropriate, her behavior agitated/restless, her mood anxious, angry and depressed, and her thought process irrational and dichotomous.  Tr. 292.

On June 22, Rogers told Ball that she was recovering from a visit with her in-laws, whose children, she believed, stole her GERD medication.  Tr. 290.  Her cat was pregnant again; Rogers had not had her cats fixed.  Tr. 290.  Her husband had gotten her a new puppy but was not helping her housebreak it.  Tr. 290.  She continued to avoid others, stayed home as much as possible, and believed others were out to hurt her due to her history of abuses from her mother, partners, and a former friend.  Tr. 290.  She reported getting very irritated when others do not do things the way they should, such as when people know she is behind them and they hold her up.  Tr. 290.  She does not think that she should have to speak up to ask them to let her by.  Tr. 290.  She reported that she had been accused of having a "bad attitude" which has contributed to all of

her job losses.  Tr. 290.  Upon exam, her mood was angry, her thought process dichotomous, her insight and judgment fair, her affect appropriate and her behavior cooperative.  Tr. 290.

On June 25, 2015, Rogers saw Corcelli for medication management.  Tr. 287.  Her problems with nightmares and itching had improved, but she still had problems with irritability and anxiety and had a panic attack "[e]very once in a while," for instance at the grocery store or where there was a lot of people.  Tr. 287.  She mentioned her road rage incident when she confronted a driver she thought was following her.  Tr. 287.  She rated her depression 10/10 and stated that she tries to stay home and that she tends to sleep a lot.  Tr. 287.  Her new puppy was keeping her very busy.  Tr. 287.  Upon exam, she had average activity, was adequately groomed, had average eye contact, clear speech, a constricted affect, cooperative behavior, logical thoughts, and fair insight and judgment.  Tr. 287.  Corcelli indicated that her status was "improving."  Tr. 289.

On July 14, 2015, Rogers saw Ball and reported that she found her previously missing and presumed stolen GERD medication under a table.  Tr. 332.  Her puppy was now completely housebroken and her cat had had her kittens.  Tr. 332.  Her son and his girlfriend had moved out and her husband's friend who had been staying in the house was told to leave after he came home inebriated and urinated all over the bathroom.  Tr. 332.  She was angry most of the time and "just figures she has to be that way."  Tr. 332.  She referenced abuse from her mother and her mother favoring her sister over her.  Tr. 332.  She continued to report dissatisfaction with her husband and was waiting to be approved for disability benefits so that she would have the money to leave him.  Tr. 332.  Ball reminded her that her irritable response is caused by her own outlook and attitude and that she could change.  Tr. 332.

On August 7, Rogers saw Corcelli for medication management and reported that her anger issues have improved since her medication dosage was increased. Tr. 329. She still had anger "at times," part of which had to do with her husband. Tr. 329. She moved out and in with her son for a day but moved back home because she did not want to burden her son. Tr. 329. She was still self-isolating and cannot be around people because she gets rude if she has any problems. Tr. 329. She was in a traffic jam for a half-hour the day before, screamed at the police officer directing traffic, and was angry for 10-15 minutes after that. Tr. 330. Corcelli noted that Rogers' status was improving. Tr. 331.

On August 14, 2015, Rogers told Ball that she still wanted to leave her husband and hoped to get disability benefits. Tr. 327. She relayed that when she had left him he had already changed the locks before she returned, his abuse had worsened, and she regretted that she had returned. Tr. 327. She went back because of her animals. Tr. 327. Ball counseled her on planning a leave so that the next time she left she had what she needed with her and would not need to return; she also advised Rogers to speak to legal aid. Tr. 327.

On September 10, Rogers told Ball that she had recently traveled to West Virginia for her uncle's funeral and was reminded how much better she felt in the mountains. Tr. 325. She slept for 8 hours straight, which she rarely does. Tr. 325. She stated that she was slowly putting together a stash of things she will need for when she leaves her husband and would like to move to West Virginia. Tr. 325. She hoped to leave once she got money from disability benefits. Tr. 325. Upon exam, she was cooperative, had an appropriate affect, was angry and depressed, and had dichotomous thoughts. Tr. 325.

On October 30, 2015, Rogers told Ball that she is making minimal progress, if any, after having learned that her husband was going to lose his job and would be home more. Tr. 322.

She is upset with her mother-in-law, who expected Rogers to run errands for her promptly and at any time, and she "doesn't want to go to the store because the people there 'make me mad…they don't do what they are supposed to do....Stay out of my way, or get out of my way when I say excuse me.'" Tr. 322. Ball wrote, "[Rogers] pretty sure that others are responsible for all her feelings." Tr. 322. Her exam findings were similar to her prior visit. Tr. 322. Ball invited Rogers to look for one good thing in each day to show that the whole day was not bad. Tr. 323.

On November 3, Rogers relayed to Corcelli how much she enjoyed going to West Virginia and staying with relatives and she considered whether this might be a better place for her to live because people there were so nice. Tr. 318. She again expressed dread that her husband would be off work soon and home more and how he expected her to wait on him and constantly told her to do things. Tr. 318. Corcelli observed that it seemed Rogers' mood was better when she was away from her husband and listed her condition as stable. Tr. 318, 320.

On November 30, Rogers saw Ball and reported problems with her husband and "insist[ed] that 'everybody' should know how she wants them to behave, and [it] make[s] her angry when they don't." Tr. 316. She explained that she used to be happy and outgoing but that she turned angry and now wants to be alone most of the time. Tr. 316. She reported that this began after she experienced several losses, including her maternal grandmother who was her true nurturer and protected her from her abusive mother. Tr. 316.

On December 18, Rogers returned to Ball and said she was excited for Christmas because her elder son, who lives in Indiana, is coming to visit. Tr. 314. She applied for food stamps at the Jobs and Family Services Center and got angry with the problems in the parking lot and with all the commotion in the room. Tr. 314. She was also angry because her sister told her that she, her sister, had been made the executor of their father's will and also that her stepbrother is a

beneficiary.  Tr. 314.  Rogers believed her sister told her this just to make her angry.  Tr. 314.

She also relayed a history of her mother and step-mother treating Rogers' children worse than

they had treated her sister's children.  Ball counseled Rogers on controlling her responses to

things and told her that she has the power to change her life.  Tr. 315.  Rogers' exam findings

were similar to past findings.  Tr. 314.

On January 14, 2016, Rogers saw Corcelli and reported that the holidays had not gone

well, that her husband is home and was "agitating," they were having financial difficulty since

her husband lost his job, she had gone to get food stamps and was having panic attacks when she

goes out, and stated, "they are 'hitting me harder.'"  Tr. 310.  Corcelli adjusted her medication

and rated her condition as "baseline."  Tr. 312.

On January 27, Rogers reported several panic attacks a day due to her husband's constant

attempts to get her upset.  Tr. 335.  She is grateful that he is starting a new temporary job soon

and will be out of the house.  Tr. 335.  She was disappointed because her son could not come

from Indiana for Christmas and her mother-in-law came over and this automatically made the

day unpleasant.  Tr. 335.  She had waited too long to get her cats fixed and she now had 5 new

kittens.  Tr. 335.  She was not sure that she could do anything about her anger.  Tr. 335.  Ball

provided her with information explaining how a panic attack feels so that Rogers did not worry

that she was having a heart attack and counseled her on having realistic expectations and to

"disconnect the buttons" to decrease her responses to her husband's behavior.  Tr. 336.  Upon

exam, she was cooperative, appropriate and angry.  Tr. 335.

On February 19, Rogers repeated that she planned to leave her husband when she started

receiving disability benefits, had started researching the housing market in West Virginia where

she would like to live, and was looking forward to her husband returning to work. Tr. 354. She enjoyed watching the kittens grow and play. Tr. 354.

On March 18, 2016, Rogers told Ball hat her husband does all kinds of things to annoy or "torture" her and she spends a lot of time stewing about "what a jerk he is." Tr. 351. Rogers had sold all her kittens but was now concerned that her dog was pregnant. Tr. 351. Her food stamp assistance was reduced based on an income level that, she stated, was incorrect. Tr. 351. She was annoyed that her dogs appeared to like her husband more than her and thought that they should like her better because she feeds them and cleans up after them. Tr. 351. She expressed annoyance again that her mother-in-law and husband ask her to run errands for them even though they could do it themselves. Tr. 351.

On March 24, Rogers told Corcelli that she was under significant stress due to her husband being home; he is constantly harping on her and he and his mother continued to ask her to run errands for them. Tr. 347. She reported that her medications were helping except that her husband has told her that they are not because at some point during the day she gets fed up and threatens to punch him. Tr. 347. She spoke about some of the abuse she suffered from her mother when she was a child, stated that she does not feel safe in public, and shared that she recently had an "ugly exchange" with a stranger when she had to step aside to let him pass and he "gave her a look." Tr. 348. Upon exam, she had a constricted/blunted affect, an irritable and anxious mood, cooperative behavior, clear speech, fair insight and judgment, a logical thought process, and average activity and eye contact. Tr. 348. Her progress was stable. Tr. 350.

On April 11, 2016, Rogers saw Ball and reported that her husband continued to bother her and seemed to "get a kick out of" making her upset. Tr. 344. Ball validated the nature of her husband as an abuser. Tr. 345. She advised that Rogers discuss with her attorney how any

social security benefits she may receive could be kept apart from her husband.  Tr. 345.  Her exam findings were similar to prior exam findings.  Tr. 344.

On May 6, Rogers saw Ball and told her that she had been dreaming about how abusive her mother was to her and reiterated that she feels jealous of how her mother treated her sister.  Tr. 342.  Upon exam, she had an appropriate affect and cooperative behavior, fair insight and judgment, an angry mood, and a dichotomous thought process.  Tr. 342.

### C. Medical Opinion Evidence

#### 1. Treating Source Opinion

On April 10, 2015, Ball completed a medical source statement on behalf of Rogers.  Tr. 283-284.  Ball opined that Rogers would have difficulty more than 20% of the time getting along with coworkers without distracting them or exhibiting behavioral extremes; difficulty 11-20% of the time interacting appropriately with the general public and accepting instructions and criticism from supervisors; and difficulty less than 10% of the time asking simple questions or requesting assistance and maintaining socially appropriate behavior and adhering to basic standards of neatness.  Tr. 284.  Ball did not answer any of the other questions on the form (questions about memory, concentration, persistence, adaption, work attendance and absences), explaining that Portage Path does not have an opportunity to observe clients in a work setting.  Tr. 283-284

On April 22, 2016, Ball completed another medical source statement on behalf of Rogers.  Tr. 338-340.  Ball indicated more severe limitations in social interaction than her first opinion with respect to some items, no limitations maintaining socially appropriate behavior and adhering to basic standards of neatness, and provided some answers for other areas previously left incomplete (no limitations with memory or carrying out simple or detailed instructions, making simple work related decisions, setting realistic goals and making plans independently

from others; moderate limitations working with others without being distracted by them, responding appropriately to changes in a work setting, and traveling in unfamiliar places).  Tr. 338-339.  Ball again explained that she had not observed or evaluated Rogers in "anything resembling a work-place setting" and that her opinions "have been made based solely on client's report."  Tr. 340.

### 2. Consultative Examiner

On October 15, 2014, Rogers saw consultative examiner Sudhir Dubey, Psy.D., for a psychological examination in connection with her benefits application.  Tr. 261-267.  Rogers stated that she was applying for disability, per her doctor's recommendation, due to the following: sleeping problems, depression, anxiety and PTSD.  Tr. 261.  Rogers reported that her mother physically and mentally abused her.  Tr. 261.  She indicated that her relationship with her husband was "okay" and her relationship with her two sons, aged 19 and 26, was "good."  Tr. 262.  Her emotional support system included her husband, sons, father, and sister, and she interacted with them daily and every few days.  Tr. 262.  She stated that she started receiving treatment for depression and anxiety in March 2014, she complied with her treatment, and that the treatment was helpful.  Tr. 262.  Her mood for the past two years has been depressed, anxious, and angry.  Tr. 262.  Stressors included her abuse history.  Tr. 262.  She did not report thoughts of hurting herself or others.  Tr. 262.  She felt okay about herself and had occasional episodes of crying.  Tr. 262.  She denied feeling panic.  Tr. 262.  "Some" anxiety symptoms started two years prior but medication was helpful and her symptoms, triggered by environmental stressors, did not affect her functioning.  Tr. 262.  Her anxiety symptoms included chest pain and hives and her PTSD symptoms included nightmares about dying children.  Tr. 262.

Her work history included quality inspector-type jobs.  Tr. 263.  She had changed jobs in the past due to "non-alleged disability issues" and "verbal conflicts with supervisors" and her average length of time at a job was 14-30 months.  Tr. 263.  Interaction with coworkers and supervisors at work was "difficult" but she was able to meet the basic job expectations.  Tr. 263.  She was fired from her last job, which she held for 14 months, due to attitude and problems dealing with her boss.  Tr. 263.

Upon exam, Dr. Dubey observed that Rogers' physical characteristics, gestures, mannerisms, motor activity, eye contact, hygiene, grooming and dress were unremarkable.  Tr. 264.  She appeared tense, irritable, and withdrawn.  Tr. 264.  Her speech and thought processes were normal, she appeared to be oriented in all spheres, she was "generally calm and friendly," and she had no memory or concentration problems.  Tr. 264-265.  She did not need help with daily activities.  Tr. 264.  Dr. Dubey diagnosed major depressive disorder, single episode, mild severity, and anxiety disorder, NOS.  Tr. 265.

With respect to social functioning, Dr. Dubey commented that Rogers' "overall behavioral style" was "stable" and she would have "some issues" dealing with co-workers and supervisors "related to possible problems stemming from mood related problems leading to associated frustration for the claimant, co-workers, and supervisors."  Tr. 267.  She would be able to understand, remember, and carry out simple and multi-step instructions independently in a work setting.  Tr. 266.  Overall, she would have some issues dealing with work pressure, again related to "possible problems stemming from mood related problems leading to associated frustration for the claimant, co-workers, and supervisors."  Tr. 267.

### 3. Employer opinion

In September 2014, a representative from Rogers' last place of employment, Joan Fisk, completed a work activity questionnaire on behalf of Rogers. Tr. 150-151. Fisk indicated that Rogers completed all her work duties without assistance, regularly reported to work as scheduled, took the same amount of time to complete her work as other employees, received no special accommodations, was 80% as productive as other employees, was frequently absent from work, and her work was satisfactory when compared to other employees. Tr. 150-151.

In October 2014, the social security agency contacted Fisk to ask about Fisk's indication that Rogers was 80% productive, given the fact that Fisk had not indicated that Rogers required special assistance or had any problems. Tr. 214. Fisk explained that Rogers was frequently absent, was often caught on camera not doing her work but walking around and "lollygagging," her language was inappropriate for the workplace for other employees and customers, she persisted in using "colorful" language despite "being talked to about it," she would not comply with the break policy and used "juvenile techniques" to describe what she was doing, and she would purposely let wrong/faulty products pass inspection. Tr. 214-215. The employer believed that she had the capacity to do the job correctly because she would do it correctly but then "apparently she would not care and just wander around." Tr. 214. Her employer tried putting her in another position to no avail and she was eventually let go "due to all-around performance and not doing her job." Tr. 214-215.

### 4. State Agency Reviewing Physicians

On November 22, 2014, state agency psychologist Karen Terry, Ph.D., reviewed Rogers' record. Tr. 67-72. Dr. Terry considered mental health listings and found that Rogers had moderate difficulties in maintaining social functioning and maintaining concentration, persistence and pace. Tr. 68. She found that Rogers was partially credible, explaining that the

objective evidence did not fully support Rogers' allegations that she was unable to work due to mental health issues. Tr. 69. She gave great weight to Dr. Dubay's opinions. Tr. 70. Regarding Rogers' residual functional capacity ("RFC"), Dr. Terry opined that Rogers had no limitations understanding, remembering, and carrying out very short and simple instructions, remembering locations and work-like procedures, or making simple, work-related decisions. Tr. 70-71. She was not significantly limited in her ability understanding and remembering detailed instructions, maintaining concentration for extended periods, performing a normal work schedule, maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness, and sustaining an ordinary routine without special supervision. Tr. 70-71. She had moderate limitations in carrying out detailed instructions, working in proximity to others without being distracted by them, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers without distracting them, and completing a normal workday and workweek without interruption. Tr. 70-71. Her ability to interact with the general public was "markedly limited." Tr. 71. Dr. Terry opined,

> Claimant can relate superficially and minimally with others when she chooses to; however, will perform optimally in more solitary setting that does not require collaborative efforts with others for task completion and doesn't require her to interact with the general public. Though it appears she has some issues with direct supervision, it appears that she may also need some supportive guidance to help her adjust to work stressors. Thus, she should not be required to have constant direct over-the-shoulder and/or provide supportive guidance. Correction/Criticism needs to be presented in a constructive manner.

Tr. 71.

On January 24, 2015, state agency psychologist Janet Souder, Psy.D., reviewed Rogers' file and adopted Dr. Terry's opinions. Tr. 79-84.

### D. Testimonial Evidence

#### 1. Rogers' Testimony

Rogers was represented by counsel and testified at the administrative hearing. Tr. 33-50. She lives in a house with her husband and has been married for 16 years. Tr. 34, 38. Currently, her husband is unemployed. Tr. 34. She last worked about two years prior to the hearing as a latex inspector. Tr. 36-37. She worked there for about one year. Tr. 36. She got fired because "I had a really bad attitude." Tr. 36. When asked if it was due to a specific incident or just a bad buildup over the time she was there, Rogers replied, "Both." Tr. 36. She stated that the man there talked down "like women were nothing" and "he told me to shut my mouth or something. I forget what it was but I went off and I told him if he didn't leave me alone I was going to slice his throat." Tr. 38. Prior to that, she worked for another company as in inspector and was fired because "I had an attitude." Tr. 37-38. She explained, "Well, the boss said that he told me to work on a Saturday and he did not. So I precisely got in his face and told him he did not." Tr. 38. The longest period of time she has held the same job is five years. Tr. 37. The ALJ asked Rogers if she had these problems in settings other than work and Rogers replied that she had these problems at work and at home. Tr. 38.

Rogers listed her medications: Sertraline for depression, Lamotrigine, hydroxyzine, and Prazosin. Tr. 34-35. She went to Portage Path once a month to see her psychiatrist and once every three months for medication management. Tr. 38. Sometimes her medication is not working really well so they adjust it "and, you know, just ongoing thing until we get it right." Tr. 38. When asked who she interacts with on a regular basis besides her husband, she stated that she sees her adult son about every two weeks. Tr. 39. She has no friends but she has three dogs and two cats and "I'm good to go with those." Tr. 39.

When asked why she was not able to work, Rogers stated that she can't stand being around people, they make her nervous or mad, and she wants to go off and hit somebody. Tr. 39.

When asked if anything has changed since she had worked the same job for five years, Rogers stated, "No." Tr. 39. When asked how she was able to maintain that job for so long, Rogers replied, "I was younger." Tr. 39. The ALJ asked, "But in terms of your condition, nothing's changed?" and Rogers stated, "No." Tr. 39. Rogers' attorney asked her what she meant when she answered that she was able to keep a job for longer when she was younger and Rogers explained, "I wasn't so—I took more stuff then, you know,—I let it just blow over and I think it just all exploded at—I just got too much and it exploded." Tr. 39. As she has gotten older, she does not like people telling her what to do; she also stated that she has never liked people telling her what to do. Tr. 40.

When asked how she reacts now compared to how she reacted then, Rogers stated that now she is quicker to hit somebody or threaten them. Tr. 40. For instance, if she is driving and someone is following her too close, she will get out of her car at a stop light "and go at them." Tr. 40. She has only done that once, two or three months prior. Tr. 40. The man in the car apologized and Rogers told him not to let it happen again. Tr. 40. "I was going to, you know, hit him." Tr. 40. Rogers also explained that, once, a man hit her son and she called the police, but when the police didn't do anything "I went down to the house myself and I beat the guy's car in with a baseball bat and told him to come out here because I was going to beat the [sic] with a baseball bat." Tr. 41. She also yelled at a police officer who had been directing traffic because the officer told her to go one way, she thought, but apparently she went the wrong way, and the officer yelled at her. Tr. 41. "I was like, uh-uh, you don't yell at me." Tr. 41. She maintains that the officer told her to go the wrong way "and then he wants to be a jerk about it so I'm going to yell at him." Tr. 41. Something like that will make her very, very angry for about an hour or

an hour and a half.  Tr. 41.  During that time, she is acting like a jerk, throwing stuff, punching and kicking stuff, and slamming doors.  Tr. 42.  She has put her hand though doors.  Tr. 42.

Rogers testified that she does not think she could handle a boss or supervisor telling her what to do because she can't handle people talking negative to her or talking down to her like she is below their level.  Tr. 42.  It doesn't matter what they say to her, if they are talking down to her she will react.  Tr. 41-42.  She cannot overlook it; she gets mad and will go towards their face; "I'll go after them."  Tr. 42.  Sometimes, she has issues with sadness.  Tr. 43.  She is scared something will happen to her kids or her animals.  Tr. 43.  She sleeps a lot.  Tr. 43.  She does not want to leave the house because she worries she will get into a car accident, that someone will back up and hit her or that someone following her will hit her.  Tr. 43-44.  She also did not leave the house for two weeks during the Ebola outbreak because she was scared she was going to get it.  Tr. 43-44.  Her mood goes up and down.  Tr. 43.

Rogers testified that she has also had anger problems in the last six months with "bill companies like if they don't make my bills right," her landlord who refused to give her and her husband their land contract, and her father when she learned that he made her sister in charge of his estate even though Rogers is the oldest.  Tr. 44-45.  She "went off" on these people.  Tr. 44-45.  She goes grocery shopping and prefers to go early in the morning when there is not a lot of people there.  Tr. 45.  If there were a lot of people they would crowd her; "It's like they're on me.  They're stuck to me like glue."  Tr. 45.  She gets nervous and starts having anxiety attacks "and it's just not right."  Tr. 46.  She has panic attacks at least once or twice a week and they last anywhere from 15 minutes to half the day.  Tr. 46.  These are caused by worrying about her animals, her kids, and thinking about herself dying and leaving her kids.  Tr. 46.

On a typical day, Rogers sleeps, watches television, takes care of her animals, and sometimes cooks and cleans. Tr. 48. When asked, Rogers confirmed that the road rage incident with the driver she described had only happened once, and added, "But I've wanted several more times to do it." Tr. 48. The last time she hit someone was "in college" and she does not do it anymore; "I really go to the point where I could hit somebody but I try to hold myself back," but it is not very easy. Tr. 48. The ALJ asked whether charges were brought against her when she vandalized another's car and Rogers stated, "No." Tr. 48. She does not know why. Tr. 49. She has never been arrested. Tr. 49. The ALJ again asked why her last employer let her go and Rogers stated, "Because the lady told me to shut up and I went into her office and told her she don't tell me to shut up. I'm a grown woman, which there was cuss words in there." Tr. 50. When asked if she had a lot of absences when she worked there Rogers stated that when she was getting her teeth done she did, but she always cleared her appointments with her employer before she would leave. Tr. 50.

### 2. Vocational Expert's Testimony

Vocational Expert ("VE") Bruce Holdereed testified at the hearing. Tr. 50-62. The VE discussed Rogers' past work as an inspector/packager. Tr. 51-53. The ALJ asked the VE to determine whether a hypothetical individual with Rogers' age and education could perform Rogers' past work or any other work if the individual had the following characteristics: can perform work at any exertional level, can perform simple, routine tasks that do not involve arbitration, negotiation or confrontation; cannot direct the work of others or be responsible for the safety or welfare of others; can perform tasks that can be learned in 30 days or less; cannot perform piece rate work or assembly line work; and can have occasional interaction with others. Tr. 53-54. The VE answered that such an individual could not perform Rogers' past work but

could perform work as a laboratory equipment cleaner (150,000 national jobs); laundry worker (70,000 national jobs); and hospital cleaner (85,000 national jobs).  Tr. 54-55.

The ALJ asked the VE if the jobs he identified would still be available if the individual described above had the following, additional limitations: the individual can relate superficially and minimally with others but would do better in a more solitary setting that does not require collaborative efforts with others for task completion and does not require interaction with the general public; cannot tolerate constant, over-the-shoulder supervision; criticism would need to be presented in a constructive manner; and the individual would benefit from having an on-site supervisor available to provide supportive guidance.  Tr. 56.  The VE answered that the supervisor requirement would essentially be an accommodation.  Tr. 57, 59.  Accordingly, the VE did not think that there would be competitive employment for such an individual.  Tr. 58. The ALJ asked the VE whether the first individual he described could perform the jobs identified by the VE if the individual would be off task 15-33% of the time and VE answered that such an individual could perform no work.  Tr. 60-61.

Next, Rogers' attorney asked the VE whether the first individual described by the ALJ could perform work if that individual was further limited by needing two unscheduled breaks lasting about 20 minutes, in addition to the regularly scheduled breaks, in order to calm down. Tr. 61.  The VE answered that there would be no work for such an individual.  Tr. 61.  Rogers' attorney asked the VE if his answer would change if the unscheduled breaks would only be needed two days a week and the VE stated that his answer would not change.  Tr. 61-62.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his June 17, 2016, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2016. Tr. 14.

2. The claimant has not engaged in substantial gainful activity since August 30, 2014, the alleged onset date. Tr. 14.

3. The claimant has the following severe impairments: anxiety disorder, post-traumatic stress disorder ("PTSD"), and major depression. Tr. 14.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 15.

5. The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to simple, routine tasks that do not involve arbitration, negotiation, or confrontation. She cannot direct the work of others, or be responsible for the safety or welfare of others. She is limited to tasks that can be learned in 30 days or less. She cannot perform piece rate work or assembly line work. The claimant is limited to occasional interaction with others. Tr. 16.

6. The claimant is unable to perform any past relevant work. Tr. 20.

7. The claimant was born on October 1, 1969 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 20.

---

[1] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq.* The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

8. The claimant has at least a high school education and is able to communicate in English. Tr. 20.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. Tr. 21.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 21.

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 30, 2014, through the date of this decision. Tr. 21.

## V. Plaintiff's Arguments

Rogers challenges the ALJ's decision on two grounds: the ALJ improperly rejected the opinions of the state agency reviewing doctors and his finding that Rogers' statements were inconsistent violated SSR 16-3p and lacked substantial evidence. Doc. 14, pp. 1, 14-25.

## VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## VII. Analysis

The Court is unable to determine whether substantial evidence supports the ALJ's decision due to unexplained conclusions in the ALJ's decision. For instance, the ALJ doubted Rogers' credibility because she testified she was let go from her last job due to her "bad attitude." The ALJ observed that her prior employer did not state that she lost her job due to a "bad attitude" on a Social Security Administration form. Tr. 17. However, the employer did explain that Rogers was frequently absent, was often caught on camera not doing her work but walking around and "lollygagging," her language was inappropriate for the workplace for other employees and customers, she persisted in using "colorful" language despite being "talked to about it," she would not comply with the break policy and used "juvenile techniques" to describe what she was doing, she would purposely let wrong/faulty products pass inspection, and she did her job correctly at times and at other times "apparently she would not care and just wander around." Tr. 214-215. These items can reasonably be summed up as having a "bad attitude."[2] In other words, Rogers' characterization of her work problems were consistent with her employer's characterization of her work problems.

Second, the ALJ stated that, despite the severity of Roger's allegations, her treatment was "conservative." Tr. 17. Rogers saw Corcelli or Ball at Portage Path about twice a month and was regularly prescribed and took numerous medications. The ALJ does not explain what other treatment Rogers could or should have undergone. Without more, the ALJ's observation about Rogers' conservative treatment rings hollow.

Third, the ALJ stated that most of Rogers' anger appeared to be directed towards her husband and her marriage and stated, "She has not had any arrests, nor has she attacked anyone."

_____

[2] The employer filled out a form and, subsequently, provided explanations during a phone call initiated by the agency. Tr. 214-215. The ALJ did not reference the explanations provided in the phone call, although it was part of the evidence considered by the ALJ. Tr. 25 (listing Exhibit 6E).

Tr. 20.  It is not clear whether the ALJ believes that in order to have disabling anger a person must attack people or be arrested.  It is possible, as Defendant speculates in her brief, that this is a credibility assessment: the ALJ did not believe Rogers' testimony that she yells at police officers and beat a car with a baseball bat and, yet, never had legal trouble, and so the ALJ must have concluded that Rogers was embellishing her tales of angry outbursts.  Doc. 15, p. 18.  But it is Defendant who offers this explanation, not the ALJ.  It cannot be determined from the decision what the ALJ meant when he stated that Rogers' anger is not disabling based on the fact that she had never been arrested or attacked anyone.

Finally, the ALJ stated that Rogers had testified that her symptoms had been essentially the same for years, and yet she was able to work with them without any major accommodation. Tr. 20.  This is true: Rogers stated that she has always had issues with others:

> Q [ALJ]: Why would you not be able to work now?
> A: I just can't stand being around people. They just make me nervous or they make me mad and I want to go off and I want to hit somebody.
> Q: Since—has anything changed since you had that [] job that you had for five years?
> A: No.
> Q: How were you able to maintain that job for that long?
> A: I was younger.
> Q: But in terms of your condition, nothing's changed?
> A: No.

Tr. 39.  But upon questioning from her attorney, Rogers explained that by being younger she meant that she "took more stuff then, you know, ... I let it blow over and I think it just all exploded and—I just got too much and it exploded."  Tr. 39.  Now, as opposed to when she was younger, she is more quick "to hit somebody or threaten them, or you know."  Tr. 40.  The record supports Rogers' assertion that she complained that her condition had become worse upon the death of her grandmother sometime in 2013.  See Tr. 262, 278, 316.  In other words, the ALJ cherry-picked: he chose to rely on one portion of Rogers' testimony but did not address another

conflicting portion, and the record contains evidence that corroborates Rogers' testimony that her condition has worsened the last few years. The error was not that the ALJ did not credit this latter evidence, but that the ALJ did not recognize the conflict and explain why he chose to credit one portion over another. *See, e.g., Minor v. Comm'r of Soc. Sec*., 513 Fed. App'x 417, 435 (6th Cir. 2013) (error occurs when the ALJ cherry-picks select portions of the evidence when discrediting the claimant's statements rather than discussing a full analysis of the evidence).

The ALJ's treatment of the above-cited evidence also renders his reliance upon the opinion evidence faulty because he relies on the above evidence, in part, to support his reasons for the weight he assigned to the opinion evidence. For example, he gives Ball's opinion little weight because it was based on Rogers' reports and because Rogers' symptoms had not worsened. Tr. 19. Although Defendant's brief offers a cohesive review of all the evidence and reasonable conclusions that one may draw from them, Defendant's brief is not the ALJ's decision. Appropriate explanations are not found in the ALJ's decision and the Court is unable to determine whether substantial evidence supports it. Therefore, the decision must be reversed. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994) (insufficient credibility determination requires reversal). On remand, the ALJ will reassess Rogers' statements and her credibility and revisit the weight given to opinion evidence.

**VIII. Conclusion**

For the reasons set forth herein, the Commissioner's decision is **REVERSED and REMANDED** for further proceedings consistent with this opinion.[3]


IT IS SO ORDERED.


Dated: April 24, 2018

Kathleen B. Burke
United States Magistrate Judge

---

[3] This opinion should not be construed as a recommendation that, on remand, Rogers be found disabled.